IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **JOSEPH WRIGHT,**<br><br>                  **Plaintiff,**<br><br>v.<br><br>**AMAZON.COM, INC.,**<br><br>                  **Defendant.** | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:19-CV-00086-DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendant's Motion for Summary Judgment [EFC No. 24] and Defendant's Motion to Exclude Plaintiff's Liability Expert Rick McDaniel [EFC No. 22]. The Plaintiff and Defendant each filed a Citation of Supplemental Authority Pursuant to Local Rule DuCiv 7-1(B)(4). The court held a hearing on these motions on October 14, 2020. At the hearing, Nathan Langston represented the Plaintiff and William Brendan Murphy, Monique R. Wirrick, and Katherine E. Venti represented the Defendant. After carefully considering the memoranda and other materials submitted by the parties, as well as the facts and law relevant to the motions, the court enters the following Memorandum Decision and Order.

## BACKGROUND

*Amazon Services Business Solutions Agreement*

When a third-party wants to sell a product on amazon.com, it must sign the Amazon Services Business Solutions Agreement (the "Seller Agreement") and provide its business name (including any DBA), address, phone number, email address, credit card number, state-issued identification, and bank account information. The Seller Agreement obligates third-party sellers to, among other things, source its own products, provide product information like description and

price,[1] identify itself as the seller, and take responsibility for defects in its products. Pursuant to the Seller Agreement, when a person makes a purchase from a third-party on amazon.com, Defendant receives the information first, creates order numbers, and then shares that order information with the third-party vendor. Defendant then collects all the sales proceeds and remits the proceeds to the third-party seller minus associated fees.

Under the Seller Agreement, Defendant charges the third-party sellers two types of fees. First, third-party vendors pay a monthly fee in exchange for Defendant's role in processing payments, refunds, and other adjustments. Second, Defendant charges third-party vendors a referral fee, which is a percentage of the price of each item sold on amazon.com. To accomplish the payments of these fees, the Seller Agreement requires that sellers allow Defendant "to act as [its] agent for purposes of processing payments, refunds and adjustments for [transactions], receiving and holding Sales Proceeds on [the seller's] behalf, remitting Sales Proceeds to [the seller's] Bank Account, charging [the seller's] Credit Card, and paying Amazon and its Affiliate amounts [the seller] owe[s] in accordance with [the Seller Agreement] or other agreements [the seller] ha[s] with Amazon Affiliates." The Seller Agreement also states that the relationship is that of "independent contractors" and that "nothing in the agreement will create any partnership, joint venture, agency, franchise, sales representative, or employment relationship between" the parties. Lastly, the Seller Agreement gives Defendant unilateral power to remove the product or change the listing's content, appearance, and design.

---

[1] Amazon encourages the third-party vendors to have "price parity" with similar products sold on amazon.com.

*The Application Process*

Before a seller can list a product on amazon.com, it must complete an application. During this application process, Defendant screens the seller and its products. First, Defendant screens the seller to ensure it is not fraudulent or otherwise malicious. After Defendant vets the applicant, it will then ensure the product does not infringe another's intellectual property rights or is not too risky. Once a seller and its product are fully approved, Defendant continues to monitor the seller and its product. For example, Defendant continually runs algorithms that look for keywords[2] in customer reviews that indicate product safety concerns. If Defendant identifies a safety concern, it will suspend the product listing and withhold funds from that seller pending an investigation about the product's safety. Lastly, if a seller's product reaches sales of $10,000 for three consecutive months, Defendant requires the seller to obtain liability insurance.

*Plaintiff's Order & Defendant's Monitoring of the MZS Brakes*

On June 2, 2017, Plaintiff bought MZS-brand brake levers for his used motorcycle. When Plaintiff placed this order, MZS shipped the brake levers directly to Plaintiff. It is undisputed that Amazon did not directly design, manufacture, convey title, ship, package,[3] write the warnings,[4] select the product for sale,[5] source the product from another manufacturer, or set the price[6] for the brake levers. The parties do dispute whether Defendant made any representations, statements,

---

[2] Keywords include, among others, "wrecked," "crashed," "killed," "died," "death," and "dangerous."
[3] Plaintiff claims, without evidence, that he recalls receiving the brake levers in an Amazon-branded shipping box.
[4] This is not in dispute only because there were no warnings or instructions included in the packaging at all.
[5] Plaintiff only argues that Defendant does perform some level of screening before third-party vendors can sell their products on amazon.com.
[6] Plaintiff does not dispute that Defendant did not set the price, but that Defendant exerts influence over the price.

or warranties for the brake levers. Plaintiff claims Defendant made such representations, statements, or warranties through its A-to-Z guarantee.

Shortly after purchasing the brakes, Plaintiff installed the levers on his motorcycle. On the first ride after installing the brake levers, and after traveling only a short distance down the road, Plaintiff applied the brakes, which allegedly malfunctioned, locking up the front wheel and causing Plaintiff to crash. It is this incident that prompted Plaintiff to file his Complaint.

Defendant removed the brake levers from its website after Plaintiff filed this action. The parties dispute whether any reviews of the MZS brake levers should have triggered a suspension of those sales before Plaintiff made his purchase and subsequently filed this action.[7] After removing the product, Defendant fully blocked MZS's account because MZS refused to respond to Defendant's indemnification demands and did not provide appropriate testing documentation to show that the product complied with safety standards.

***The Complaint & Plaintiff's Expert***

On January 17, 2019, Plaintiff filed the Complaint against Defendant in Utah's Third Judicial District Court. The Complaint asserts three causes of action across six counts: strict products liability (manufacture defect, design defect, and failure to warn); breach of warranty; and negligence (duty to warn). On February 7, 2019, Defendant removed the case to this court.

During discovery, Plaintiff retained Rick McDaniel as the only liability expert in this matter. McDaniel is the mechanic who inspected the motorcycle on the day of Plaintiff's crash. As an expert, McDaniel signed a two-page report in which he opines about the brake seizure due to the alleged defective and dangerous design. McDaniel is an auto and motorcycle mechanic,

---

[7] Plaintiff offered as evidence some customer reviews that likely would have triggered a suspension. Defendant, however, notes that in Mr. Pfau's (Amazon's Rule 30(b)(6) expert) deposition that Plaintiff's counsel admits the reviews were not for the same brake lever.

spending the last seven years strictly as a motorcycle mechanic. McDaniel has no publications on brake levers and has not researched brake lever manufacturing, design, or causes of failure. In short, his qualifications and opinions rest solely on his experience as a mechanic.

## DISCUSSION

I. **Defendant's Motion to Exclude Plaintiff's Liability Expert Rick McDaniel**

Defendant moves to exclude McDaniel's liability or causation testimony because: (A) he lacks the relevant expertise, education, or training to opine on manufacture or design defects; and (B) even if McDaniel was qualified, his testimony is not the product of reliable principles and methods. The court will address each of these arguments in turn.

A. **Knowledge, Skill, Experience, Training, or Education**

Rule 702 of the Federal Rules of Evidence states that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" if, based on "the expert's scientific, technical, or other specialized knowledge," the expert's testimony "will help the trier of fact . . . determine a fact in issue." Here, the issues are manufacture and design defects.

> To testify that a challenged product is defectively designed, the expert must be qualified to testify that the utility of the alternative design outweighs the utility of the challenged design, and that use of an alternative design would have eliminated or reduced the injuries suffered. To be qualified to evaluate the utility of a design, the witness must be proficient at evaluating such factors as the intended use of the product, its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect.

*Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1049 (D. Colo. 2011) (internal formatting and citation omitted).

5

When an expert's qualifications are challenged, "[t]he proponent of expert testimony bears the burden of demonstrating" that the expert is indeed qualified. *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970 n. 4 (10th Cir. 2001). "An expert who possesses knowledge as to a general field but lacks specific knowledge does not necessarily assist the jury. Proposed expert testimony must therefore fall within the reasonable confines of the witness's expertise." *Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 807 (10th Cir. 2016) (internal citations and quotation marks omitted).

In this case, the plaintiff offers two reasons why McDaniel is qualified to give his opinion. First, McDaniel has been a motorcycle mechanic for over seven years. Second, Plaintiff attempts to buttress McDaniel's qualifications by noting his second-hand and "personal experience with similar, knock-off brake levers." Neither McDaniel's experience as a mechanic or his previous experiences with similar knock-off brake levers are sufficient to establish that he is qualified to opine about product design and manufacture.

Regarding his years as a mechanic, McDaniel has no experience, education, or training in mechanical engineering, product design, material sciences, or other similar fields related to the manufacture or design of brake levers. Certainly, McDaniel's experience as a mechanic qualifies him to opine about mechanical issues with the motorcycle. But, without proper foundation, McDaniel is not qualified to opine about the adequacy of the design, manufacture, and function of the brake levers. *See Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) (noting that if "one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness *if* a proper foundation were laid for [the witness'] conclusions" (emphasis in original)). Indeed, as McDaniel's own report states: "I am qualified and have experience in working on every type of motorcycle mechanical issue

6

that can arise." Mechanical issues—not design or manufacturing defects—are the limits of McDaniel's qualifications as an expert.

McDaniel's "personal experience with similar, knock-off brake levers" is also insufficient to establish that McDaniel is an expert in the relevant fields. Most importantly, McDaniel's experience with similar, knock-off brake levers is extremely limited. McDaniel only notes a single first-hand experience with knock-off brake levers; an after-market brake lever malfunctioning on a Ducati. In that instance, McDaniel noted "that [the brake lever] [was] not the same" as the lever in question because "the way the lever and the master cylinder plunger interact are different." [ECF No. 32 p. 255.] One experience with a different type of brake lever is not sufficient experience to be an expert in this instance. Similarly, McDaniel's second-hand knowledge and experiences are also insufficient. McDaniel testifies that he has heard other mechanics and customers complain about after-market brake levers locking up the front wheel or causing front wheels to "drag." [ECF No. 32 pp. 236–37, 259–61.] These experiences and "shop talk" are insufficient bases to form the necessary qualifications to opine about design or manufacture defects of brake levers.

For the foregoing reasons, the court finds that any of McDaniel's "knowledge, skill, experience, training, or education" is limited to mechanical issues on motorcycles, not the design or manufacture of brake levers. Therefore, McDaniel may not opine about defective design, feasible alternative design, improper manufacture, or other similar matters.

### B. Sufficient Facts and Data and Reliable Principles and Methods

Rule 702 requires that an expert's testimony be "based on sufficient facts or data" or "the product of reliable principles and methods." Courts look to the *Daubert v. Merrell Dow Pharmaceuticals, Inc.* factors to determine reliability. 509 U.S. 579, 592–95 (1997). These

7

factors are oft-repeated by the courts, and while they "are not holy writ," they should not be quickly dismissed or disregarded. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 159 (1999) (Scalia, J., concurring). These factors ask a court to look at whether: the expert's theory can be or has been tested; whether the theory has been subjected to peer review or publication; the known or potential error rate of the technique or theory the expert employed; the use of standards and controls; and whether the techniques or theories are generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 592–95.

In applying these factors, a court should "focus on the methodology employed by the expert rather than the precise conclusions reached. But where the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion." *Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 808 (10th Cir. 2016) (internal citations omitted) (unpublished). Additionally, in products liability cases, "testing is not always required to satisfy the reliability threshold of Rule 702" but "it is particularly important when a proposed expert relies on novel theories or where the basis for the expert's opinion is subject to debate." *Heer v. Costco Wholesale Corp.,* 589 F. App'x 854, 862 (10th Cir. 2014) (citation omitted) (unpublished). Indeed, where an "expert's theories are not grounded in well-established scientific principles, the importance of testing as a factor in determining reliability is at its highest." *Id.* at 862 (internal quotation marks and formatting omitted).

The Tenth Circuit applied these principles in *Heer v. Costco Wholesale Corp.* and excluded plaintiff's expert witness on the defective design of a step stool after plaintiff was injured because the leg of her step stool bent, causing her to fall and break her arm. *Id.* at 856. In *Heer*, the expert, Mr. Stolz, had a master's degree in mechanical engineering, was registered as a

professional engineer in Colorado, and had given expert testimony in previous cases. *Id.* at 857. In his expert report, the court noted that Mr. Stolz's "laboratory examination consisted solely of [his] observations and measurements of the step stool." *Id.* Based merely on the observation and a few measurements, Mr. Stolz concluded that the plaintiff's "fall was not the result of misuse or failure to follow warnings, but instead was due to a defect in the design of the step stool's leg." *Id.* The defendant moved to exclude Mr. Stolz's testimony because his methodologies were not reliable. *Id.* at 858. The court agreed. *Id.* at 861–63.

> In reviewing Mr. Stolz's methodology, the Tenth Circuit noted that Mr. Stolz's report
>
> provided no scientific basis for its conclusion that a defect in the step stool's design caused [plaintiff's] fall. Mr. Stolz made no attempt to test his theory, nor did he make any calculations, apply any engineering principles to his causation theory, discuss any industry standards, or mention any scientific authority that supported his theory.

*Id*. at 861. Thus, the report left the court "[w]ithout scientific or technical support for Mr. Stolz's theory." *Id.* at 861. Accordingly, the *Heer* court upheld the district court's determination that Mr. Stolz's methods were unreliable and his testimony was properly excluded. *Id.*

Like Mr. Stolz's methods, McDaniel's methodology and principles do not meet the *Daubert* standards and leave the court with unsubstantiated, conclusory opinions about **_why_** the lever was defective. McDaniel performed a very brief and superficial examination of the brake lever before concluding it was defective. In his deposition, McDaniel testifies: his only inspection of the lever was on the day of the accident. [ECF No. 32 p. 200–01]; he did not inspect other levers or compare the MZS lever to other levers [ECF No. 32 p. 205]; his inspection consisted of recognizing the brake was after-market[8] and the wheel was locked up, so

---

[8] Neither Plaintiff nor McDaniel has adduced any evidence to support McDaniel's theory that aftermarket, foreign-manufactured brake levers are widely known or accepted as more likely to be defectively designed or manufactured.

9

he removed the brake and handed it to Plaintiff [ECF No. 32 p. 206]; that as part of his investigation he did not take any measurements, photos, or check the brake fluid temperature [ECF No. 32 p. 233]; and he has not tested his theory that heat can cause malfunctions in poorly manufactured brake levers. [ECF No. 32 pp. 247–48.] None of McDaniel's methods meet any of the *Daubert* factors or even begin to examine if the lever was poorly machined or defectively designed.

McDaniel's methodology and be reduced to three steps: recognizing a mechanical issue (locked front wheel); identifying a potential explanation (after-market lever);[9] and drawing a conclusion (the lever was poorly machined or designed). It is difficult to imagine that such a cursory investigation could allow McDaniel to properly conclude that "poor machining of the lever causes the plunger to block or partially block the bleed hole." [ECF No. 22-3 p. 2–3.] McDaniel never took any steps to test his conclusion; he never examined the bleed hole, plunger, or any of the internal workings of the MZS lever. [ECF No. 32 pp. 206, 233.] Additionally, McDaniel never substantiated his claims that the brake lever "was installed correctly" because "[i]t can only be installed one way." [ECF No. 22-2 p. 12.] To the contrary, Defendant's design expert demonstrated how brake levers can be installed in more than one way and that improper installation can cause the front brakes to lock up [EFC No. 38-1.] In sum, McDaniel's methods—or, more accurately, the lack thereof—require the court to make too many assumptions and logical leaps to arrive at the conclusion that the lever was "designed defectively" because "poor machining caused the plunger to block or partially block the bleed hole." [ECF No. 22-3 p. 2–3.]

---

[9] The court notes that this step in the logical chain is extremely flawed. Concluding that a defect must exist since a lever was manufactured overseas is an illogical assumption. McDaniel's own testimony states that Ducati's OEM lever is manufactured in Italy. Additionally, the fact that a lever is "after-market" does not point to a lower-quality or defective device. Again, McDaniel's own testimony shows that he has installed after-market levers on motorcycles.

In short, McDaniel did nothing to test, show, discuss, or examine whether the plunger actually blocked the bleed hole or how and why the bleed hole was allegedly blocked in this instance. Without such a discussion, examination, or showing, the court is left to either take McDaniel's word about causation or speculate about causation. As the gatekeeper, the court may not do so.

For the foregoing reasons, the court concludes that McDaniel's methodology and principles are insufficient to meet the Rule 702 standards and, therefore, his testimony about causation or defective design or manufacture should be excluded. Thus, at most, McDaniel could offer testimony as a percipient fact witness. However, even as a percipient witness, the parties do not dispute what McDaniel observed and, therefore, his testimony is not helpful in this instance. Accordingly, the court finds that McDaniel's testimony is entirely excluded.

## II.  Defendant's Motion for Summary Judgment

Defendant moves for summary judgment on two grounds. First, defendant argues that it is not a "seller" and, therefore, all of Plaintiff's claims fail as a matter of law. Second, Defendant argues that, if McDaniel's testimony is excluded, Plaintiff has no admissible evidence to tie his injury to a defect in the brake levers and, therefore, Plaintiff's claims must be dismissed. The court bases the remainder of the Memorandum Decision and Order upon Defendant's argument that Plaintiff does not have admissible evidence of a defective product.

Plaintiff's complaint brings six causes of action against Defendant: (1) strict products liability—design defect; (2) strict products liability—manufacture defect; (3) strict products liability—failure to warn; (4) breach of warranty; (5) negligence; and (6) negligence—duty to warn. All these causes of action[10] require a showing that the product was defectively designed,

---

[10] Even Plaintiff's breach of warranty claim requires a showing that the brake lever caused his injuries. *See Straub v. Fisher & Paykel Health Care*, 990 P.2d 384, 389 n.1 (Utah 1999).

11

defectively manufactured, or in some way caused the Plaintiff's injuries.[11] Thus, without an expert to opine on these matters, Plaintiff's claims fail as a matter of law.

For the foregoing reasons, the court finds that the Defendant is entitled to summary judgment because Plaintiff cannot meet his burden of proof as to the elements of each of his asserted causes of action. The court will not address the issue of whether Amazon is a "seller" because Plaintiff's lack of admissible evidence of defect or causation is a sufficient bases to grant summary judgment.

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendant's Motion to Exclude Plaintiff's Liability Expert Rick McDaniel. [EFC No. 24.] Thus, without an expert to opine on causation or design or manufacture defects, the court GRANTS Defendant's Motion for Summary Judgment [EFC No. 22]. Accordingly, all the Plaintiff's claims are dismissed with prejudice.

Dated this 22d day of October, 2020.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge

---

[11] At the hearing, Plaintiff's counsel conceded that it was extremely likely that Plaintiff could meet his burden of proof on any of his claims without McDaniel's testimony.